**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS DIVISION**

**TONYA G. DAVIDSON,**

      **Plaintiff,**

**v.**                                **Civil Action No. 2:11-cv-55**
                                         **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [10], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[11], AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.   INTRODUCTION

On July 26, 2011, Plaintiff Tonya G. Davidson ("Plaintiff"), by counsel Kevin M. Pearl,

Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant

Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant

to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No.

1.) On September 28, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant

United States Attorney, filed an answer and the administrative record of the proceedings. (Answer,

ECF No. 6; Administrative Record, ECF No. 7.) On October 28, 2011, and November 28, 2011,

Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot.

for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 11.)

Following review of the motions by the parties and the administrative record, the undersigned

Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   BACKGROUND

## A.    *Procedural History*

On April 27, 2005, Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") alleging disability that began April 15, 2004.  (R. at 99; *see also* R. at 96-98.)  This claim was initially denied on August 30, 2005 and again upon reconsideration on March 6, 2006.[1]  (R. at 45-46.)  On April 13, 2006, Plaintiff filed a request for a hearing, which was held before United States Administrative Law Judge ("ALJ") James J. Pileggi on October 18, 2007 in Pittsburgh, Pennsylvania.[2]  (R. at 54-58.)  On October 31, 2007, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act ("Act").[3]  (R. at 13, 37.)  On June 11, 2009, the Appeals Council granted Plaintiff's request for review, vacated the decision of the ALJ, and remanded the case for further proceedings.  (R. at 37-39.)  On October 19, 2009, a second hearing was held before ALJ Randall W. Moon in Wheeling, West Virginia.  (R. at 47-51, 933.)  Plaintiff, represented by Michael Simon, Esq., appeared and testified, as did Eugene Czuczman, an impartial vocational expert.  (R. at 933-34.)  On January 15, 2010, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Act.  (R. at 13-35.)  On May 27, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 3-5.)  Plaintiff now requests judicial review of the ALJ's decision denying her application for DIB.

## B.    *Personal History*

---

[1] In her motion for summary judgment, Plaintiff asserts that her claim was initially denied on September 7, 2005 and again upon reconsideration on March 8, 2006.  (Pl.'s Mot. at 2.) However, the Disability Determination and Transmittal sheets included in the record show dates of August 30, 2005 and March 6, 2006.  (R. at 45-46.)

[2] The record does not contain a transcript from this hearing.

[3] The record does not contain a copy of ALJ Pileggi's decision.

Plaintiff was born on June 5, 1969 and was 35 years old at the time she filed her application for DIB. (R. at 96, 99.) She completed two years of college (R. at 111) and has prior work experience as a dental hygienist and waitress (R. at 105). Plaintiff was single at the time she filed her application for DIB but is now married to Larry Main. (R. at 97, 938.) She has no dependent children. (R. at 97.)

## C. Relevant Medical History

On April 15, 2004, Plaintiff was admitted to the Wheeling Hospital after her involvement in a motor vehicle accident. (R. at 180-81.) According to records, Plaintiff struck a utility pole while driving. (R. at 181.) Plaintiff complained of pain in her right ankle and around her nose. (*Id.*) She also had pain in the area of her left fifth metacarpal and had bruising around her left radial head. (R. at 183.) An X-ray revealed that Plaintiff had a pilon type fracture of her distal tibia and a fracture of her distal fibula. (R. at 181, 217.) Dr. Derek H. Andreini conducted an open reduction internal fixation operation on Plaintiff's right ankle fracture and applied a posterior splint. (R. at 184-85.) Also, a CT scan of Plaintiffs head was negative for any intracranial hemorrhage or abnormal attenuation. (R. at 216.) X-rays of Plaintiff's spine, left hand, and pelvis were normal. (R. at 218-21.) Views of Plaintiff's chest appeared normal, with no acute or active pulmonary disease. (R. at 222-23.)

On April 16, 2004, Plaintiff underwent an X-ray of her left wrist at Wheeling Hospital. (R. at 211.) After taking six views of Plaintiff's wrist, no fractures were identified. (*Id.*) That same day, an X-ray of Plaintiff's right ankle showed "improved post reduction alignment." (R. at 212.) An X-ray of Plaintiff's left elbow revealed "no definite acute bony abnormality." (R. at 214.) Plaintiff was discharged on April 19, 2004, with instructions to restrict her activities and to use non-

weight bearing crutches.  (R. at 180.)

On April 29, 2004, Plaintiff had a follow-up appointment with Dr. Andreini for her pilon type fracture.  (R. at 466.)  Dr. Andreini removed Plaintiff's posterior splint and noted that her incision was well-healed.  (*Id.*)  After X-rays were taken, Dr. Andreini noted his opinion that Plaintiff had a "nicely healing pilon fracture."  (*Id.*)

On May 13, 2004, Plaintiff's X-rays from an examination of her right ankle were submitted for interpretation.  (R. at 478.)  Hospital records note that there was anatomic alignment of bony structures and that there was a "well positioned distal fibular shaft fracture."  (*Id.*)  Dr. Andreini's notes also state that Plaintiff had "much less pain" in her wrist at that time.  (R. at 467.)  An examination performed thirteen days later demonstrated no interval change from the previous examination.  (R. at 479.)

Plaintiff had her first appointment with Dr. David Kappel on May 26, 2004.  (R. at 631.)  At this appointment, Dr. Kappel instructed Plaintiff to continue to elevate and wrap her ankle to control the edema in her foot.  (*Id.*)  That same day, Plaintiff had a follow-up appointment with Dr. Andreini, who noted that Plaintiff continued to have some swelling and pain in her lower extremity. (R. at 467.)  However, he also reported that her pilon type fracture was "anatomically aligned with good hardware placement" and that her fibula fracture looked "quite good."  (R. at 468.)

On May 28, 2004, Plaintiff entered the emergency department of the Ohio Valley Medical Center ("OVMC") with chest and back pain.  (R. at 227, 233.)  An examination revealed tenderness in Plaintiff's mid-epigastric area and point tenderness in Plaintiff's right upper quadrant.  (*Id.*)  An examination of Plaintiff's lungs revealed "no evidence of pleural effusion or pneumothorax."  (R. at 229.)  Also on May 28, 2004, an examination of Plaintiff's right ankle revealed "excellent

alignment of the fracture fragments." (R. at 480.) On May 29, 2004, Plaintiff underwent a laparoscopic cholecystectomy to remove her gall bladder. (R. at 237.) She was discharged on June 1, 2004. (*Id.*)

Plaintiff saw Dr. Kappel again on June 1, 2004. (R. at 629.) On June 22, 2004, Dr. Kappel reported that Plaintiff had been having trouble with her left wrist, and he ordered a bone scan to determine if Plaintiff had suffered a slight compression fracture. (R. at 628.) By July 9, 2004, Dr. Kappel noted that Plaintiff's ankle was completely healed. (R. at 627.)

On June 12, 2004, Plaintiff was sent to Wheeling Hospital because of concerns about a blood clot in her left arm. (R. at 250.) An examination revealed redness in Plaintiff's left forearm and intermittent tingling in her left hand. (*Id.*) Plaintiff denied a fever. (*Id.*) Two days later, Plaintiff had an appointment with Dr. Andreini, who noted that the swelling in her lower extremity was significantly improved. (R. at 469.) However, Dr. Andreini wanted Plaintiff to begin hand therapy for "soreness in her right wrist with ulnar and radial deviation." (*Id.*)

Plaintiff began physical therapy at Wheeling Hospital Physical Therapy on June 15, 2004. (R. at 356.) Treatment records of Plaintiff's appointments demonstrate that she often tolerated her assigned exercises well. (*See, e.g.*, R. at 284, 288, 293, 298-302, 305, 307-11, 320-22, 325-26, 329, 332, 341, 344, 349-50.) On October 18, 2004, Plaintiff reported that she felt she had been "progressing well." (R. at 288.) On October 27, 2004, one of the last appointments included in the administrative record, Plaintiff stated that she had very little knee pain but complained of continued right ankle pain. (R. at 284.) On March 14, 2005, at her initial evaluation, Plaintiff stated that she had no complaints and that she thought her right ankle sprain was healing well. (R. at 599.) Plaintiff was discharged from physical therapy on March 16, 2005 because she felt that she was improved

from when she began physical therapy and that she no longer needed physical therapy. (R. at 413-14, 598, 602.)

Plaintiff began treatment at the Wheeling Hand Center of the Wheeling Hospital on June 22, 2004. (R. at 452.) She reported that she had difficulties with dressing herself, opening doors, writing, turning a key, and doing her job as a dental hygienist. (*Id.*) An examination of Plaintiff's wrist revealed sensation within normal limits but significantly decreased grip strength. (*Id.*) Dr. Mary Laska noted an excellent prognosis and that Plaintiff appeared "highly motivated to increase functional use of the hand." (R. at 453.) At many of her appointments with the hand therapy department, Plaintiff reported an increase in pain. (*See, e.g.,* R. at 424, 425, 426, 432, 437, 438, 439, 444, 445, 447, 448, 449, 450.) However, on other days, Plaintiff reported that she felt her wrist was improving and becoming stronger. (*See, e.g.,* R. at 424, 428, 429, 430, 431, 435, 436.) On March 14, 2005, Plaintiff reported feeling tearful and that she did not feel she would be able to return to her work as a dental hygienist. (R. at 434.) Plaintiff repeated those concerns a month later, but also stated that she was considering future plans for employment and was also considering returning to school for a teaching certificate. (R. at 428.)

On June 23, 2004, Plaintiff underwent an MRI of her right knee. (R. at 481.) The examination revealed an "abnormal signal associated with the posterior cruciate ligament that represents either a complete tear or a high grade partial tear." (*Id.*) A lateral meniscus tear, medial collateral ligament strain, and small knee joint effusion were also noted. (R. at 481-82.)

On July 1, 2004, Plaintiff was admitted to Wheeling Hospital with complaints of pain in her right knee, right ankle, and left wrist. (R. at 256.) A bone scan revealed "abnormal areas of increased uptake" within Plaintiff's proximal right fibula, distal right tibia, distal right fibula, and

right second rib.  (*Id.*, *see also* R. at 484.)  These findings were attributed to Plaintiff's previous trauma.  (*Id.*)  On July 2, 2004, Dr. Andreini performed a diagnostic arthroscopy to treat Plaintiff's lateral meniscal tear.  (R. at 254.)  After the procedure, Dr. Andreini noted that Plaintiff had "some improved range of motion of the ankle and good stability of the ankle."  (R. at 470.)  He also reported that Plaintiff lacked about ten degrees of full extension in her knee.  (*Id.*)  Plaintiff was discharged on July 3, 2004.  (R. at 264.)

On July 9, 2004, Plaintiff's orthopedic doctor sent her to see Dr. Miguel Lopez for sadness and depression.  (R. at 406.)  Plaintiff told Dr. Lopez that she felt sad and depressed after her motor vehicle accident.  (*Id.*)  Dr. Lopez noted that Plaintiff was very cooperative, had a good sense of humor, and was alert and oriented.  (*Id.*)  After meeting with Plaintiff, Dr. Lopez considered TSH because of Plaintiff's mild thyroid gland enlargement.  (R. at 407.)  Dr. Lopez informed Plaintiff that a second evaluation would depend on the TSH results and that antidepressants would be considered at the second evaluation.  (*Id.*)

On July 12, 2004, Plaintiff visited the radiology department at Wheeling Hospital for an examination of her left wrist.  (R. at 412.)  This examination was requested by Dr. Lopez.  (*Id.*)  The examination revealed no "displaced fracture or dislocation."  (*Id.*)

On July 29, 2004, Plaintiff had a follow-up appointment for her right knee arthroscopy with Dr. Andreini.  (R. at 471.)  Dr. Andreini noted that she had "well healed arthroscopic portals" and that there was no knee effusion.  (*Id.*)  He also reported that she had excellent knee stability and that while she lacked approximately five degrees of full extension, this was a "significant improvement compared to prior to surgery."  (R. at 472.)  His notes also indicate that Plaintiff had excellent ankle stability and that her pilon type fracture was "well aligned with good hardware placement and good

callous formation." (R. at 471-72.)

On August 20, 2004, Dr. Kappel noted that the MRI taken of Plaintiff's left wrist demonstrated: 1) extensor carpi ulnaris tendonitis; 2) tendonitis along the extensor carpi radialis brevis and longus; 3) partial tear scapholunate ligament and TFCC; and 4) sprain/strain of the dorsal ligaments of the wrist. (R. at 627.) About three weeks later, Dr. Kappel noted that Plaintiff's pain was about the same, but that her grip strength was increased and her range of motion was satisfactory. (R. at 383.)

On September 9, 2004, Dr. Andreini noted Plaintiff's complaints of "pain over the right medial tibial plateau anteriorly over the dorsum of her ankle." (R. at 472.) Specifically, he reported that palpating the plantar surface of Plaintiff's fifth metatarsal head was "quite uncomfortable." (R. at 473.) However, Dr. Andreini also found that Plaintiff lacked about three degrees of full extension in her knee and that this was a significant improvement from her last appointment. (*Id.*) X-rays showed that her right knee was within normal limits and that there was "good alignment of the fracture and good hardware placement" in her ankle. (*Id.*)

On October 15, 2004, Dr. Patricia Bailey completed a psychological evaluation of Plaintiff after Plaintiff was referred to her by Dr. Lopez. (R. at 773-776.) Dr. Bailey noted that Plaintiff was alert and oriented, but also displayed deficits in her attention, concentration, and memory. (R. at 775.) Dr. Bailey assessed Plaintiff with post-traumatic stress disorder and major depressive disorder, single episode, severe with psychosis. (R. at 776.) She also assigned her a Global Assessment of Functioning ("GAF") score of 45. (*Id.*)

Plaintiff began regular treatment with Dr. Bailey on October 27, 2004. (R. at 772.) Throughout 2004, Dr. Bailey's notes reflect that Plaintiff often had continued difficulties with pain,

depression, and sleep disturbances. (R. at 771-74.) Plaintiff felt overwhelmed by her physical and emotional problems. (R. at 772.) Dr. Bailey also noted that Plaintiff's pain interfered with her mood, concentration, energy level, and sleep. (*Id.*)

On November 1, 2004, Dr. David Kappel performed an arthroscopy and open repair scapholunate ligament complex on Plaintiff's left wrist. (R. at 274.) Dr. Kappel implanted two transverse K-wires to stabilize Plaintiff's scapholunate junction. (R. at 275.) His postoperative diagnosis was scapholunate ligament disruption and injury to the TFCC. (R. at 274.) Throughout November, Dr. Kappel noted that Plaintiff was recovering quite well. (R. at 382.) On December 13, 2004, Dr. Kappel removed the two K-wires from Plaintiff's wrist. (R. at 269.)

On November 11, 2004, Plaintiff had a follow-up appointment with Dr. Andreini, where she complained of pain over her "right knee medial compartment." (R. at 473.) He noted that she continued to lack about five degrees of full extension but that she displayed excellent knee stability. (R. at 473-74.) Dr. Andreini expressed his desire to receive a second opinion from Dr. Michael Rytel, an orthopedic specialist in Pittsburgh, Pennsylvania. (R. at 474.)

On January 4, 2005, Plaintiff saw Dr. Kappel again, and he noted that her range of motion in her wrist was up thirty-five degrees. (R. at 381.) He did find some tender nodules in her left hand and thought that they were early Dupuytren's nodules. (*Id.*) Later in January, Dr. Kappel noted that Plaintiff was "coming along pretty well in therapy except for her grip strength." (*Id.*)

On February 18, 2005, Dr. Kappel performed an injection extensor carpi ulnaris tendinitis on Plaintiff because of the displacement of the Mitek anchor in her left wrist. (R. at 369.) He also removed her Mitek anchor. (R. at 381.) A day later, Plaintiff was admitted to the Wheeling Hospital for postoperative pain, nausea, and vomiting. (R. at 365.) Hospital records noted that

Plaintiff did well with appropriate pain medications and antiemetics.  (*Id.*)  Plaintiff also stated that the pain her wrist was "well controlled with p.o. pain medications." (*Id.*)  Plaintiff was discharged on February 21, 2005. (*Id.*)

An examination of Plaintiff's right ankle on March 1, 2005 revealed no acute fracture or malalignment.  (R. at 394, 411.)  An examination of Plaintiff's right knee on the same day also revealed no fracture or malalignment and no joint effusion.  (R. at 395.)  On March 12, 2005, an MRI of Plaintiff's right knee was "essentially negative."  (R. at 485, 611.)

On March 7, 2005, Plaintiff saw Dr. Andreini for pain in her right knee after her knee gave out and caused her to fall.  (R. at 474.)  Plaintiff had good stability in her knee, but lacked about eight degrees of full extension.  (*Id.*)  X-rays revealed no acute fractures in her knee or ankle.  (R. at 475.)  Dr. Andreini thought that Plaintiff suffered a lateral hamstring strain and sent her for an MRI.  (*Id.*)  Two weeks later, Dr. Andreini saw Plaintiff again and noted that her MRI was within normal limits, but that she was still having "significant pain over the medial tibial plateau and medial joint line."  (*Id.*)    He sent her to see Dr. Rytel again.  (*Id.*)

On March 9, 2005, Plaintiff saw Dr. Kappel again.  (R. at 380.)  She said that her wrist was "doing great" until the end of the last week but that "all in all she's fairly happy with how things are going."  (*Id.*)  About two weeks later, Plaintiff reported to Dr. Kappel that she and her therapist had devised a plan for her to attend remedial dental hygiene school.  (R. at 379.)  Dr. Kappel also noted that Plaintiff's grip strength was still poor but that her pinch strength was improved.  (*Id.*)  However, on April 29, 2005, Dr. Kappel noted that Plaintiff's evaluation for rehabilitation as a dental hygienist did not go well; he also informed her that her flexibility would probably not improve much.  (*Id.*)

When Plaintiff saw Dr. Lopez on May 25, 2005, she reported that she felt well but still had

a decreased level of energy. (R. at 653.) He noted that she was sleeping a little better and that her depression was controlled. (*Id.*)

On May 26, 2005, Plaintiff saw Dr. Andreini again for a follow-up appointment. (R. at 475.) She reported that she did not have a chance to visit Dr. Rytel, and Dr. Andreini noted that Plaintiff had no complaints of knee pain. (*Id.*) However, Plaintiff stated that if she plantar flexed her foot, she felt "as if her achilles tendon [was] going to explode." (R. at 475-76 (alteration in original).) She was also experiencing a painful lateral malleolus and hypersensitivity over the distal third of her tibia. (R. at 476.) Dr. Andreini noted that Plaintiff was walking well with no evidence of a limp, and X-rays revealed that her ankle fracture had healed nicely. (*Id.*) In his opinion, Plaintiff was doing "extremely well considering the severity of her fracture" and thought that her soreness was from scar tissue pulling and stretching from her becoming more active. (*Id.*) Dr. Andreini explained to Plaintiff that her foot and ankle would never be like they were before her accident, and he discharged Plaintiff from his care with the understanding that she would call with any questions or difficulties. (R. at 477.)

On May 31, 2005, Plaintiff told Dr. Kappel that she was going to go to Bethany College for Environmental Hygiene. (R. at 626.) Dr. Kappel noted that her range of motion had improved, but that her grip strength had not. (*Id.*) About two weeks later, Dr. Kappel found that Plaintiff's grip strength was about the same and that her range of motion had actually decreased "a little bit." (*Id.*) On August 23, 2005, Dr. Kappel reported that Plaintiff's numbers were improved and that she was attending West Liberty University for accounting/business. (*Id.*) However, on November 22, 2005, Plaintiff told Dr. Kappel that her psychologist had "recommended that she not return to school." (R. at 625.)

On August 30, 2005, Dr. Frank Roman completed a Psychiatric Review Technique of Plaintiff. (R. at 488-501.) Dr. Roman noted that Plaintiff suffered from mild depression, but that her depression was not severe. (R. at 488, 491.) He determined that she was mildly limited in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, and pace. (R. at 498.) Overall, Dr. Roman noted that Plaintiff "appears fully credible." (R. at 500.)

On September 29, 2005, Plaintiff told Dr. Lopez that she had been feeling well after not taking Wellbutrin for two weeks and then during the third week started feeling depressed and sad. (R. at 648.) Dr. Lopez restarted Plaintiff on Wellbutrin and requested a CT scan of Plaintiff's head. (R. at 649.) On November 15, 2005, Dr. Lopez noted that Plaintiff was doing well on Wellbutrin and that she had a good mood and a good energy level. (R. at 646.) This assessment remained unchanged on February 21, 2006. (R. at 644-45.)

Plaintiff continued to see Dr. Bailey on a regular basis during 2005. (R. at 759-71.) During these appointments, Plaintiff often reported continuing sleep disturbances and a deterioration in her mood, particularly because of her pain. (*See, e.g.,* R. at 759, 760, 762, 763, 764.) Dr. Bailey also noted that Plaintiff had deficits in her ability to concentrate and in her memory, and that these led to a negative impact on Plaintiff's self-esteem. (R. at 762-63, *see also* R. at 764.) During many of her appointments, Plaintiff appeared unable to accept the fact that she could not return to her work as a dental hygienist. (R. at 764, 765, 767, 768-69.) She also reported feeling a desire to withdraw from her family and friends. (R. at 761, 762, 765.) However, at one appointment, Plaintiff admitted that she was no longer having flashbacks and nightmares about her accident. (R. at 761.) Furthermore, on September 12, 2005, Plaintiff admitted that she had not been taking her prescribed

antidepressant for the past three months.  (R. at 762.)

On January 11, 2006, Dr. Porfirio Pascasio completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (R. at 502-10.)  Dr. Pascasio determined that Plaintiff could occasionally lift and/or carry twenty pounds; could frequently lift and/or carry ten pounds; could stand and/or walk and sit for about six hours in an eight-hour workday; and had no restrictions on pushing or pulling.  (R. at 503.)  He also found that Plaintiff could frequently climb ramps and stairs; could never climb ladders, ropes, and scaffolds; and could occasionally balance, stoop, kneel, crouch, and crawl.  (R. at 504.)  Overall, Dr. Pascasio noted that Plaintiff only appeared to be partially credible and that her limitations were not disabling.  (R. at 507.)  He determined that she could perform light work with the indicated limitations.  (*Id.*)

On February 22, 2006, Dr. Anthony Golas completed a psychological evaluation of Plaintiff. (R. at 511-18.)  Dr. Golas noted that Plaintiff was pleasant and cooperative and had some sense of humor.  (R. at 514.)  He reported that Plaintiff had a euthymic mood with a labile affect.  (R. at 515.)  However, he found that Plaintiff had markedly deficient recent memory and moderately deficient remote memory.  (*Id.*; *see also* R. at 518.)  Subjectively, Plaintiff complained of pain, stiffness, a limited range of motion, depression, anxiety, and post-traumatic stress disorder.  (R. at 516.)  Dr. Golas also noted Plaintiff's complaints of "disrupted sleep, craving food all the time, confusion, difficulty concentrating, and irritability." (*Id.*) Objective, Dr. Golas found that Plaintiff's responses to the Beck Depression Inventory-II yielded a score of 45, placing her in the severe depression category.  (*Id.*)  Her responses to the Burns Anxiety Inventory yielded a score of 76, placing her in the extreme anxiety or panic category.  (*Id.*)  Dr. Golas diagnosed Plaintiff with major depressive disorder, single episode, severe without psychotic features; panic disorder without agoraphobia; and

post-traumatic stress disorder. (*Id.*) However, he also noted that Plaintiff's prognosis appeared to be good. (R. at 517.)

On March 6, 2006, Dr. Rosemary Smith Completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique of Plaintiff. (R. at 519-36.) She found that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. at 519.) Dr. Smith noted that Plaintiff retained the "ability to learn and perform simple, unskilled work-like activities." (R. at 521.) She also found that Plaintiff was mildly limited in her activities of daily living, in maintaining social functioning, and maintaining concentration, persistence, and pace. (R. at 533.) However, Dr. Smith noted that Plaintiff had not returned her current adult function report, and that Plaintiff was not credible regarding her problems with concentration and getting along with others. (R. at 535.)

On May 16, 2006, Dr. James Petrick completed a neuropsychological examination of Plaintiff. (R. at 634-40.) He noted that she described some emotional lability and that her mood was "clearly depressed" during the examination. (R. at 635.) Dr. Petrick also reported that Plaintiff's license to practice as a dental hygienist had been terminated and that Plaintiff stated she "'feels out of control.'" (*Id.*) After testing Plaintiff, Dr. Petrick determined that she was able to "follow both simple and complex commands." (R. at 637.) During the examination, Plaintiff admitted to feelings of restlessness, failure, guilt, irritability, and loss of confidence. (R. at 639.) Testing revealed that she had a "severe affective disturbance consistent with a primary mood disorder" with related anxiety and increased social isolation. (*Id.*) However, Dr. Petrick also noted that Plaintiff was "independent with all basic activities of daily living" and that she was familiar with "basic computer technology." (R. at 636.) Dr. Petrick assessed Cognitive Disorder Not Otherwise Specified with

features of Post-Concussion Syndrome and a secondary diagnosis of Mood Disorder Not Otherwise Specified secondary to head trauma. (R. at 640.) However, he also noted that Plaintiff should consider vocational rehabilitation efforts and that she had expressed an interest in mortuary science. (*Id.*)

Plaintiff again saw Dr. Lopez on May 30, 2006. (R. at 641.) At this appointment, she reported that she had been having no response to Wellbutrin and that she had been experiencing continued mood swings. (*Id.*) At this appointment, Dr. Lopez assessed depression versus borderline personality and referred Plaintiff to Dr. Corder. (R. at 642.)

On September 8, 2006, Plaintiff saw Dr. Steven Mills. (R. at 685.) At this appointment, she reported experiencing severe mood swings where she would go from being angry to crying. (*Id.*) She also stated that she had been having severe back pain every morning but felt better after eating. (*Id.*) Plaintiff noted that she was also unable to sleep and handle stress. (*Id.*) Three months later, Plaintiff told Dr. Mills that she had been experiencing a "stressful month." (R. at 888.)

Plaintiff continued to see Dr. Bailey on a regular basis during 2006. (R. at 749-59.) Again, Dr. Bailey noted that Plaintiff was experiencing isolation from her family and friends, depression, anxiety, and deficits in her memory and concentration. (*See id.*) Plaintiff continued to struggle with the fact that she could not return to her work in dental hygiene. (R. at 752, 753, 754.) On April 10, 2006, Dr. Bailey sent a letter to Dr. Kappel, in which she wrote that Plaintiff continued to have post-traumatic sequalae and comorbid depression along with cognitive defects. (R. at 744.) Dr. Bailey also told Dr. Kappel that she did not think Plaintiff was a "suitable candidate to return to school at this time." (*Id.*) However, on March 21, 2006, Plaintiff admitted that she had not been taking Wellbutrin regularly because of her inability to get her medication. (R. at 756.) Furthermore,

Plaintiff reported that she saw some benefits after one month when she was switched to Lexapro because she saw improvements in her sleep, energy level, and mood. (R. at 751.) On September 8, 2006, Plaintiff told Dr. Bailey that she had been working diligently to challenge her negative thoughts and that she was more aware of the connection between her chronic pain and her mood. (*Id.*) On October 3, 2006, Plaintiff even noted that she made an effort to attend a family wedding. (*Id.*)

On January 25, 2007, Dr. James L. Cosgrove completed an independent medical examination with functional capacities of Plaintiff. (R. at 537-45.) Dr. Cosgrove's examination of Plaintiff's left wrist revealed that she had a reduced range of motion, with only twenty degrees of flexion, forty-five degrees of extension, ten degrees of ulnar deviation, and five degrees of radial deviation. (R. at 542.) His examination of Plaintiff's right knee revealed "tenderness over the medial femoral condyle." (*Id.*) Dr. Cosgrove assessed: 1) injury to the ligaments of the left wrist "with resultant pain, weakness, and decreased range of motion;" 2) a right knee injury with "possible cruciate ligament insufficiency with mild instability and pain;" and 3) pain in the right ankle "post fracture with decreased range of motion and alteration of gait." (R. at 543.) He also noted that it was unclear whether Plaintiff's work as a dental hygienist could be adapted so that she could use her left hand in a modified or limited manner. (*Id.*)

Dr. Cosgrove noted that Plaintiff would be "best served by getting back into competitive employment within the functional capacities set forth." (R. at 543.) He determined that Plaintiff could continuously sit for eight hours (more than eight hours with rests), could continuously stand for four hours (eight hours with rests), and could continuously walk for half an hour (four hours with rests). (R. at 544.) She could occasionally lift and carry ten pounds with her left arm, frequently

bend, occasionally squat, never crawl or climb, and could frequently reach above her head with her left arm and continuously with her right.  (*Id.*)  Dr. Cosgrove noted that Plaintiff could not use her left hand for simple grasping and pushing/pulling.  (*Id.*)  He reported mild restrictions of activities involving stairways, being around moving machinery, and driving automotive equipment, and moderate restrictions in activities involving unprotected heights.  (R. at 545.)  Overall, Dr. Cosgrove found that Plaintiff could perform full-time light work.  (*Id.*)

On February 7, 2007, Plaintiff had X-rays of her right knee taken at Wheeling Hospital.  (R. at 914.)  These X-rays revealed no fracture or malalignment, and there was no acute bony abnormality.  (*Id.*)  X-rays were also taken of Plaintiff's right tibia and fibula and right ankle.  (R. at 913.)  These revealed no acute bony abnormality, postoperative changes in her distal fibula, mild to moderate arthritic changes, and a plantar calcaneal spur.  (*Id.*)

On March 9, 2007, Dr. Anthony Watson performed surgery on Plaintiff's right ankle at the University of Pittsburgh Medical Center, St. Margaret.  (R. at 726.)  He performed a right ankle arthroscopy with extensive debridement of arthrofibrosis; a diagnostic subtalar arthroscopy; hardware removal; and an excision of the saphenous nerve.  (*Id.*)  Dr. Watson found dense arthrofibrosis of Plaintiff's ankle and noted that Plaintiff tolerated the surgery well.  (R. at 726, 728.)

On May 3, 2007, Plaintiff had an X-ray taken of her left wrist at Wheeling Hospital.  (R. at 910.)  These X-rays revealed "narrowing of the scaphomultangular joint, with erosions of the adjoining bony surfaces."  (*Id.*)

On October 8, 2007, Plaintiff told Dr. Mills that she had been experiencing headaches when she got cramps in her neck.  (R. at 777.)  She also reported fatigue and that she had been sleeping twelve to sixteen hours a night.  (*Id.*)

On November 15, 2007, Plaintiff told Dr. Mills that "everything" was hurting, and he assessed her with fibromyalgia. (R. at 878-79.) Plaintiff also reported that medication had been helping with her headaches. (R. at 878.) A week later, Plaintiff had X-rays of her right hand and wrist taken at Wheeling Hospital. (R. at 906.) These X-rays revealed no obvious fracture, but Plaintiff was advised that a repeat radiographic series should be done a few days later if she had persistent pain or tenderness. (*Id.*)

Plaintiff continued to see Dr. Bailey during 2007. (R. at 743, 745-48, 856-60.) Again, during these appointments, Plaintiff focused on her mood swings, her difficulties with sleeping and concentration, and her frustration over her inability to do certain things. (R. at 743, 748.) Dr. Bailey noted that she was still experiencing chronic pain and difficulties with anxiety and depression. (R. at 748, 859, 858, 857.) Overall, Plaintiff expressed feelings of helplessness, worthlessness, and feeling that her life was out of control. (*See* R. at 743, 745-48, 856-60.)

On January 3, 2008, Plaintiff told Dr. Mills that her headaches had ceased for two weeks but that she was experiencing pain in her shoulders and her left hip. (R. at 876.) He also noted tendonitis in her right wrist. (*Id.*) About three months later, Plaintiff had another appointment with Dr. Mills, where she stated that her right wrist and left ankle were worse. (R. at 874.) She also reported feeling out of control, restless, and uncomfortable. (*Id.*) On October 17, 2008, at another appointment with Dr. Mills, Plaintiff told him that her joints hurt everywhere, but that she had not been taking any prescribed medication for her symptoms. (R. at 870.) Dr. Mills also noted that Plaintiff had an appropriate mood and affect and had intact recent and remote memory. (R. at 871.)

Plaintiff had another appointment with Dr. Mills on November 18, 2008. She reported that her Lyrica prescription was doing well, but that she was still feeling "very moody." (R. at 868.) Dr.

Bailey had told Plaintiff that she wanted her on a prescription for Cymbalta. (*Id.*) One month later, at her follow-up appointment, Plaintiff told Dr. Mills that she was unsure if Cymbalta was working for her. (R. at 867.) Dr. Mills noted that Plaintiff appeared emotionally labile and depressed but that she had intact recent and remote memory. (*Id.*) He also increased her Cymbalta prescription to 90 milligrams. (*Id.*)

Plaintiff continued to meet with Dr. Bailey during 2008, although the record reflects that these appointments were usually once a month and less frequent than before. (R. at 850-56.) Again, Plaintiff reported increased crying spells, anxiety, moodiness, and pain. (*See id.*) On May 5, 2008, Plaintiff did tell Dr. Bailey that she had started taking Lyrica for her pain and that it seemed to be helping to control it. (R. at 854.) She also noted that she was experiencing feelings of not wanting to be around people or engage in social interaction. (R. at 851, 852.) However, on December 11, 2008, Plaintiff did tell Dr. Bailey that she was trying to force herself to do things. (R. at 850.)

On January 30, 2009, Plaintiff had an appointment with Dr. Robert Vawter. (R. at 801-03.) Dr. Vawter assessed joint pain at multiple sites with a possible rheumatoid factor, some problems with minor fatigue, and neck pain. (R. at 803.) Plaintiff informed him that she takes Excedrin with food which helps with joint discomfort. (R. at 801.) That same day, Plaintiff had a series of X-rays at Dr. Vawter's request taken at Wheeling Hospital. (R. at 788-95.) These X-rays revealed bilateral calcaneal spurs on Plaintiff's ankles, with the ones on her right ankle more pronounced than the ones on the left ankle. (R. at 789.) The X-ray of her ankles also revealed scarring "along the anterior margin of the right distal tibia" and "arthritic change to the anterior aspect of the talus." (*Id.*) X-rays of Plaintiff's hands, elbows, hips, and pelvis were normal. (R. at 790-92.) The X-ray of her knees showed a small calcification "along the medial aspect of the left distal femoral condyle." (R. at

793.) The X-rays of Plaintiff's wrists revealed a normal right wrist and a narrowing of the "left radiocarpal joint with question of widening of the navicular lunar distance." (R. at 794.) Finally, an X-ray of Plaintiff's spine demonstrated "slight narrowing of the C5-C6 disc space with slight spurring along the anterior margin of C5 and C6." (R. at 795.)

On February 9, 2009, Plaintiff saw Dr. Mills for a follow-up evaluation. (R. at 865.) He noted that she had spent the past month on an increased dosage of Cymbalta, but Plaintiff reported that she had stopped taking 90 milligrams and was currently taking 60 milligrams. (*Id.*) Plaintiff also noted that when she feels sad, she "gets out of control." (*Id.*) Dr. Mills' notes reflect that Plaintiff appeared emotionally labile but that she had an intact recent and remote memory. (R. at 866.) He instructed her to begin taking 90 milligrams of Cymbalta again. (*Id.*)

Plaintiff saw Dr. Vawter again on February 27, 2009. (R. at 804.) At this appointment, he added degenerative arthritis and degenerative disk disease of the cervical spine to his assessment. (*Id.*) Three months later, Dr. Vawter included rheumatoid arthritis, seropositive that is active with his assessment after Plaintiff complained of stiffness and swelling in her wrists. (R. at 806.) His assessment remained unchanged at Plaintiff's appointment on June 19, 2009. (R. at 808.)

Plaintiff saw Dr. Vawter again on July 29, 2009. (R. at 810.) At this appointment, Plaintiff told Dr. Vawter that she had "no hot swollen joints" and "no excruciating pain." (*Id.*) She also reported that she was "getting around quite well" and was trying to get out of her house a bit more. (*Id.*) Dr. Vawter saw no evidence of active synovitis and noted that Plaintiff's previous swelling was gone. (*Id.*) He also noted that "[g]etting out among other people and doing some light walking" would be "excellent" for Plaintiff. (*Id.*) On September 29, 2009, Plaintiff's last recorded appointment with Dr. Vawter, he noted that Plaintiff was getting out of her house "a bit more now"

and that her rheumatoid arthritis appeared to be clinically stable.  (R. at 862.)

On October 26, 2009, Dr. Golas completed another psychological evaluation of Plaintiff. (R. at 836-46.)  He noted that Plaintiff had an anxious and irritable mood with a broad affect.  (R. at 841.)  He also found that Plaintiff had moderately deficient judgment, concentration, and immediate memory.  (R. at 841-42.) Plaintiff also demonstrated a markedly deficient recent memory and a mildly deficient remote memory.  (R. at 842.)  Dr. Golas noted that Plaintiff's performance on the Beck Depression Inventory-II placed her in the severe range of depression, and that her performance on the Burns Anxiety Inventory placed her in the extreme range of anxiety.  (R. at 845.) Five days later, Dr. Golas completed an assessment for a disability determination.  (R. at 833-35.) He noted that she was moderately impaired in her ability to understand and remember complex instructions, moderately impaired in her ability to make judgments on complex work-related decisions, and mildly impaired in her ability to carry out complex instructions.  (R. at 833.)  Dr. Golas also reported that Plaintiff was moderately impaired in her ability to respond appropriately to usual work situations and to changes in a routine work setting because she appeared to become easily frustrated and unable to easily switch between tasks.  (R. at 835.)  However, his report also indicated that Plaintiff spends her typical day eating, showering, and cleaning up around the house. (R. at 845.)  She also reported walking and cleaning daily, doing laundry and errands once a week, and shopping once a month.  (*Id.*)

The administrative record reflects that Plaintiff had at least six sessions with Dr. Bailey in 2009.  Again, these sessions reflected Plaintiff's continued difficulties with chronic pain, depression, and sleep disturbances.  (R. at 847-50.)  On February 20, 2009, Plaintiff specifically reported that she had been experiencing crying spells several times a day.  (R. at 849.)  At her last session on

August 14, 2009, Plaintiff described her life as being "out of control." (R. at 847.)

## D.    *Testimonial Evidence*

At the hearing before the ALJ on October 19, 2009, Plaintiff testified that she married her husband in June 2008 and that they live in a one-story single family home. (R. at 938-39.) They own one cat and one dog. (R. at 940.) Plaintiff testified that she has a valid driver's license and that she drives, at maximum, once a week. (R. at 941.) She stated that she does not drive if possible, but if she does have to drive she can drive herself. (*Id.*)

Plaintiff also testified that she receives $1,950 per month from a disability policy with Metropolitan Life. (R. at 941-42.) She has received these payments since July 2004. (R. at 942.) Plaintiff noted that she recovered money from two settlements stemming from her automobile accident. (R. at 942-44.) She could not remember how much she received from one case, but she testified that she received about $800,000 when the other case settled. (R. at 944.)

Plaintiff graduated from West Liberty State College, where she received a two-year degree for dental hygiene. (R. at 944-45.) She briefly worked as an administrative assistant for US Can in 1998, seven years after graduating from college. (R. at 946, 947.) Plaintiff testified that she took a break from being a dental hygienist because she "got tired of looking in people's mouths." (R. at 946.) She stated that as an administrative assistant, she was in charge of human resources. (*Id.*) She was also responsible for filling out paperwork and loading paper in the photocopier. (R. at 947-48.) However, she went back to being a dental hygienist because she realized that she "really did love that job." (R. at 949.)

Plaintiff testified that she was recently diagnosed with rheumatoid arthritis and that she takes Methotrexate for her condition. (R. at 950.) Previously, she treated this condition with Prednisone.

(R. at 950-52.)  Plaintiff noted that she also treats her rheumatoid arthritis with "lots of warm showers" and by lying down "a lot."  (R. at 953.)  She tried physical therapy but thought it made her condition worse.  (*Id.*)

Plaintiff stated that she is also being treated for "psychological problems," such as post-traumatic stress disorder, that arose from her automobile accident.  (R. at 953.)  Her accident occurred when a tow truck hit her car and pushed her car into a telephone pole.  (R. at 954.)  She suffered a fractured ankle, a ruptured tendon in her knee, internal bruising that led to removal of her gall bladder, a broken rib, a ruptured ligament in her wrist, a broken nose, and a fractured jaw.  (R. at 962.)  Plaintiff often has anxiety attacks when she leaves her house and has to call someone to come pick her up.  (R. at 954-55.)  Overall, she stated that she cannot stand to be around people anymore.  (R. at 955.)  She takes Cymbalta for her psychological conditions.  (R. at 957.)

Plaintiff testified that she usually spends her time in her house, but that there are some days that she does not get out of bed because of her pain.  (R. at 956-57.)  She tries to do chores around the house each day, but also testified that she often has to lie down because of her pain.  (*Id.*)  She feeds her dog but cannot walk him.  (R. at 958.)  Plaintiff testified that she can walk for about ten to fifteen minutes before she has to stop and rest, and that she can stand for ten to fifteen minutes before her ankle, knees, and hips begin to hurt.  (R. at 959-60.)  She stated that she can sit for about half an hour to 45 minutes before she has to get up and move around to get comfortable.  (R. at 960.)  Overall, Plaintiff testified that she relies on her sister to take her to doctor's appointments, to go shopping for her, and to clean her house.  (R. at 963.)

*E.*      *Vocational Evidence*

Also testifying at the hearing before the ALJ was Eugene Czuczman, a vocational expert. (R. at 933-34.) Mr. Czuczman defined the local region for his testimony as West Virginia, including the five metropolitan statistical areas within West Virginia. (R. at 967.)

Mr. Czuczman classified Plaintiff's past work as a dental hygienist as customarily being light skilled work; however, he noted that because Plaintiff had been lifting fifty pounds at times during the job, she was performing the work at the medium exertional. (R. at 965.) He classified her past work as an administrative secretary as customarily being sedentary skilled work. (*Id.*) However, he noted that because Plaintiff was often lifting over twenty pounds to load the photocopier, she performed this past work at the medium exertional. (*Id.*) Mr. Czuczman noted that Plaintiff's past work as a waitress was part-time and occurred prior to the fifteen-year window. (R. at 966.) He testified that Plaintiff would not be able to perform any of her past relevant work as she performed it, but that she would be able to perform her past work as both a dental hygienist and an administrative secretary as it is customarily performed. (*Id.*)

The ALJ first asked Mr. Czuczman to assume that Plaintiff was limited to sedentary work that required no more than occasional contact with coworkers, supervisors, and the general public, and that did not require high production rates and high sales quotas. (R. at 966-67.) Mr. Czuczman testified that Plaintiff would not be able to perform any of her past relevant work with those limitations. (R. at 967.) However, he testified that she would be able to perform work as a type copy examiner, ink printer, and final assembler, and that the final assembler would be a bench job (*Id.*) Mr. Czuczman did not change his response when asked by the ALJ to assume a further restriction to jobs only involving one- to three-step tasks. (*Id.*)

Next, the ALJ asked Mr. Czuczman to assume a hypothetical individual with the same age,

education level, and work experience as Plaintiff that could perform light or sedentary work, but with the restriction that the individual's impairments would cause the individual to be "off task one hour out of an eight hour work day outside the normal breaks and lunch break." (R. at 968.) Mr. Czuczman testified that there were no full-time, unskilled jobs such a person could perform because the person would eventually be fired. (*Id.*) The ALJ then posed the same hypothetical individual, but with a different limitation that the individual would be absent three days a month on an ongoing basis. (*Id.*) Again, Mr. Czuczman testified that there were no full-time, unskilled jobs such a person could perform because the individual would eventually be fired. (*Id.*)

Plaintiff's attorney at the hearing, Michael Simon, Esq., then posed questions to the vocational expert. First, Mr. Czuczman confirmed that Plaintiff would not be able to lay down during the job with respect to work as a type copy examiner, ink printer, and final assembler. (R. at 968.) Mr. Simon then asked if an individual is required to stand on her feet with respect to work as a type copy examiner and ink printer. (*Id.*) Mr. Czuczman testified that those jobs could be performed with a sit/stand option, where the person has the ability to stand for at least ten minutes, sit for a couple of minutes, and repeat the process every ten minutes. (R. at 969.) However, Mr. Czuczman testified that an individual would not be able to perform either of these jobs if she changed positions more frequently because she would be off task for too long. (*Id.*)

## F.  *Lifestyle Evidence*

In an adult function report dated May 16, 2005, Plaintiff stated that she spends her days eating three meals, making her bed, showering, styling her hair, getting dressed, washing dishes, watching television, gathering the mail, doing laundry, completing chores such as dusting and sweeping, putting dishes away, and writing out bills. (R. at 113.) She also reported taking care of

a cat by feeding it, cleaning the litter box, and bathing it.  (R. at 117.)  According to Plaintiff, her conditions affect her ability to dress, squeeze shampoo and conditioner bottles while bathing, use a hair dryer and curling iron, shave her left leg while standing on her right leg, maneuver a razor, squeeze toothpaste tubes, and floss her teeth.  (*Id.*)

Plaintiff noted that she prepares food daily and prepares simple meals such as cereal, sandwiches, frozen pizza, and soup.  (R. at 118.)  She reported that she is able to complete housework such as vacuuming, dusting, and dishes, but that she is only able to do lawn work when she can have access to a riding lawn mower.  (*Id.*)  Plaintiff stated that she has to make herself do chores because of her depression.  (*Id.*)

At the time of the report, Plaintiff noted that she goes outside daily and that she can ride in a car, but that she had not been released to drive a car yet by her doctor.  (R. at 119.)  She shops once per week for groceries and house supplies.  (*Id.*)  Plaintiff reported being able to pay bills, count change, handle a savings account, and use a checkbook and money orders.  (*Id.*)

Plaintiff stated that she does three crossword puzzles a week, but that her memory is not the same as it used to be.  (R. at 120.)  She talks on the phone, visits with others, goes to the grocery store, goes for doctor's visits, and goes for lunch with others about three times per week.  (*Id.*)  She also goes to the hospital on a regular basis for appointments.  (*Id.*)

## G.    *Other Evidence*

The record contains an Insured's Statement of Total Disability for Prudential Financial dated July 15, 2004.  (R. at 612-20.)  In this statement, Plaintiff reported that her symptoms interfered with her ability to scale, polish, and floss in her work as a dental hygienist.  (R. at 612.)  She also stated that she was planning to go back to college for a new profession.  (*Id.*)  Dr. Kappel, as an attending

physician, included a statement that Plaintiff was unable to return to her job as a dental hygienist and that Plaintiff was currently unable to return to work because of limitations with working and using her left hand and arm.  (R. at 617.)  However, Dr. Andreini, another attending physician, included a statement that Plaintiff "should be able to return to work approximately 09/01/2004."  (R. at 619.) The record also contains an Initial Claim for Disability Benefits for Metropolitan Life Insurance Company dated July 15, 2004.  (R. at 621-25.)  In this claim, Plaintiff reported that she was unable to drive and perform dental hygienist duties such as scaling, polishing, and flossing.  (R. at 623.)

### III.   CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, asserts that the ALJ abused his discretion by rejecting "evidence supported by the record."  (Pl.'s Mot. at 9.)  Specifically, Plaintiff alleges that the ALJ erroneously rejected her subjective complaints in finding her not disabled.  (*Id.* at 5-9.) Plaintiff suggests that the ALJ erred in finding her to be not credible because he assigned little weight to her Global Assessment of Functioning ("GAF") scores and to her statements that she sleeps for long periods of time because of her medications.  (*Id.* at 6-7.)  Plaintiff asks the Court to reverse or set aside the ALJ's decision or, in the alternative, remand the case.  (*Id.* at 1, 9.)

The Commissioner, in his motion for summary judgment, asserts that the ALJ's decision "is supported by substantial evidence and should be affirmed as a matter of law."  (Def.'s Mot.) Specifically, the Commissioner alleges that substantial evidence supports the ALJ's credibility determination and that the ALJ assigned proper weight to Plaintiff's GAF scores and statements of drowsiness.  ((Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br."), ECF No. 12 at 14-15.)

### IV.   STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.   ANALYSIS

*A.*     ***Standard for Disability and the Five-Step Evaluation Process***

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . .  "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006).  The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
20 C.F.R. §§ 404.1520, 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

**B.      *Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1.      **The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits throughout the period at issue herein, i.e., April 15, 2004 to September 30, 2009, the claimant's date last insured. (See Disability Insurance Benefits Insured Status Report).**

2.      **The claimant did not engage in substantial gainful activity at any time during the period at issue. (20 CFR 404.1571 *et seq.*).**

3.      **During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: Residual effects, status-post, right ankle fracture; Residual effects, status-post, left wrist ligament injury with secondary pain and weakness; Rheumatoid Arthritis controlled with medications; Degenerative Disk Disease and Degenerative Arthritis of the Cervical Spine; History of Headaches, by report; Major Depressive Disorder; Panic Disorder; Post-Traumatic Stress Disorder; and History of Cognitive Disorder with Features of Post-Concussions Syndrome. (20 CFR 404.1520(c)).**

4.      **During the period at issue, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

5.      **During the period at issue, the claimant had only the residual functional capacity to perform a range of simple, routine, and unskilled work activity of one to three-step tasks that: requires no more than a "sedentary" level of physical exertion; entails no more than occasional contact with others (i.e. coworkers, supervisors, and the general public); and entails no high production rates or sales quotas. (20 CFR 404.1567(a)).**

6.      During the period at issue, the claimant was unable to perform any past relevant work (**20 CFR 404.1565**).

7.      The claimant was born on June 5, 1969 and was 40 years old, which is defined as a younger individual age 18-44, on the date last insured. (**Exhibit 1E1**) (**20 CFR 404.1563**).

8.      The claimant has at least a high school education and is able to communicate in English.  (**Exhibit 2E2**) (**20 CFR 404.1564**).

9.       Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (**See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2**).

10.      During the period at issue, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (**20 CFR 404.1569 and 404.1569(a)**).

11.      The claimant was not under a disability at any time, as defined in the Social Security Act, at any time from April 15, 2004, the alleged onset date, through September 30, 2009, the date last insured (**20 CFR 404.1520(g)**).

(R. at 15-34.)

## C.      *Analysis of the Administrative Law Judge's Decision*

### 1.      The ALJ Properly Evaluated Plaintiff's Credibility and Rejected Her Subjective Complaints of Pain

As her first assignment of error, Plaintiff alleges that the ALJ committed error by not finding Plaintiff disabled by her symptoms alone.  (Pl.'s Mot. at 5-6, 9.)  Specifically, Plaintiff argues that "Judge Moon made a credibility determination to disregard [her] subjective complaints that was not supported by the record."  (*Id.* at 5 (alteration in original).)  However, Plaintiff's argument is without merit because the ALJ properly rejected her subjective complaints based on medical and non-medical evidence.

The determination of whether a person is disabled by pain or other symptoms is a two-step process. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. *Craig*, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. *Id.* Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1.      The individual's daily activities;

2.      The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.      Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p,

1996 WL 374186, at *2.  Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

Neither Plaintiff nor Defendant dispute the ALJ's determination that Plaintiff "has medically determinable impairments that could reasonably be expected to cause some of the symptoms described." (R. at 19.)  Because the objective medical evidence indicates that Plaintiff does suffer from these conditions, the ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms.  *See Craig*, 76 F.3d at 585.  In fact, the ALJ explicitly mentioned evidence pertaining to Plaintiff's daily activities:

> On May 9, 2005, . . . the claimant reported enjoying crossword puzzles, and that she spent her typical day engaging in light housework, and attending doctor's appointments and physical therapy.  (Exhibit 24F2). . . . On May 16, 2005, the claimant reported that her typical day entailed preparing meals, making her bed, completing her personal care (i.e.; showering, hair maintenance, getting dressed, and applying makeup); washing dishes, watching television, doing laundry, dusting, sweeping, grocery shopping, caring for her cat, and paying bills.  (Exhibit 3E1).  The claimant, on this date, also indicated that she cared for a cat in feeding, cleaning, and buying necessities for the pet.  (Exhibit 3E5).  The claimant further reported that she was able to prepare her own meals daily, and engage in house and yard work including vacuuming, doing laundry, dusting, cleaning dishes, and riding a lawn mower.  (Exhibit 3E6).  The claimant also noted, at this time, that she gets around outside every day, rides in a car, shops in stores, pays bills, counts change, handles a savings account, and utilizes a checkbook.  (Exhibit 3E7).  The claimant further indicated that she enjoys completing crossword puzzles, and spends time with others three times a week.  She also attends doctor's appointments, and engages in lunch and visits with others. (Exhibit 3E8).
>
> On May 31, 2005, the claimant reported that she was going to attend Bethany College for Environmental hygiene.  (Exhibit 25F2).  On August 23, 2005, the claimant indicated that she was in school at West Liberty College for accounting and business.  (Exhibit 25F2).  On February 22, 2006, the claimant reported that throughout her typical day she would eat, shower, get dressed, do some light housework, watch television, and take care of her cat.  In particular, the claimant reported that she showered or bathed every day, did some cleaning each day, cleaned dishes, did some laundry once or twice a week, shopped about once or twice a

month, and rarely drove. (Exhibit 18F7). On May 16, 2006, the claimant reported that she was independent with all basic activities of daily living. She further indicated that she was familiar with basic computer technology. (Exhibit 26F3). On August 31, 2009, the claimant reported that her typical day entailed her eating, showering, and cleaning up around the house. The claimant, in particular, noted that she walked and cleaned daily. She further reported that she does laundry, drives, runs errands once a week, and shops once a month. (Exhibit 34F14).

After discussing this evidence, the ALJ then discussed medical and non-medical evidence which is inconsistent with Plaintiff's subjective complaints, including:

- Plaintiff filed her application for DIB on April 27, 2005, more than one year after her alleged onset date of April 15, 2004. (R. at 17.)

- Plaintiff's statement on May 10, 2005 that her insurance company was "'making her file'" for benefits. (R. at 19.)

- On June 22, 2004, Plaintiff reported that she was not able to dress, feed herself, open a door, write, open a jar, and turn a key without difficulty or without using her other hand; however, she also reported being able to independently bathe, wash and dry her hair, cook a meal, and take care of housework. (R. at 20.)

- Reports from Plaintiff's physical therapy sessions often noted that her pain in both her ankle and knee was improving and that she tolerated her exercises well. (R. at 20-23.)

- On November 30, 2004, after he installed temporary K-wires in Plaintiff's wrist, Dr. Kappel noted that Plaintiff was doing well with regard to her hand. (R. at 22.)

- On March 7, 2005, Dr. Andreini noted that X-rays of Plaintiff's knee and ankle did not reveal any acute fractures. (R. at 23.) Two days later, Plaintiff reported being fairly happy with her wrist. (*Id.*)

- On March 16, 2005, Plaintiff was discharged from physical therapy after reporting that she

had little to no symptoms in her right ankle.  (R. at 23.)

- At multiple times, Plaintiff made statements that she desired to go back to school to pursue other employment and was considering pursuits such as obtaining a teaching certificate.  (R. at 24.)

- On May 16, 2005, Plaintiff reported that she had no complaints of knee pain but that her Achilles tendon hurt when she flexed her foot.  (R. at 24.)  However, the practitioner noted that Plaintiff had full range of motion in her ankle and was able to walk without evidence of a limp.  (*Id.*)  Dr. Andreini also stated that X-rays showed that Plaintiff's fracture was healing nicely.  (*Id.*)

- On May 26, 2005, Dr. Andreini told Plaintiff that her foot and ankle were never going to be like they were before and that she would not be as fast or agile as she used to be, but that he expected her to be active and able to do everything she did before her accident.  (R. at 24.)

- On May 16, 2006, Dr. Petrick noted that Plaintiff could imitate simple hand gestures, that she could bilaterally reproduce sequential hand movements, and that her bilateral grip strength was good.  (R. at 25.)  Dr. Petrick also reported Plaintiff's interest in mortuary sciences and that Plaintiff should consider vocational rehabilitation efforts.  (*Id.*)

- On March 9, 2007, Plaintiff had no complications after undergoing surgery to, *inter alia*, remove hardware in her right ankle.  (R. at 26.)

- Despite her complaints of headaches, Plaintiff told Dr. Mills on December 1, 2007 that her headaches had ceased.  (R. at 26.)

- On October 17, 2008, even though he reported that Plaintiff had arthropathy everywhere, Dr. Mills also stated that Plaintiff had not been taking any of her prescribed medications.  (R.

at 27.)

- Although Plaintiff reported a fear of driving to Dr. Bailey, she also reported that in September 2004, she had recently been in a vehicle during a trip to Washington, D.C. (R. at 28.)

- On February 19, 2005, Plaintiff reported that her medications were helping with her depression, and on May 25, 2005, Plaintiff told Dr. Bailey that her mood had improved. (R. at 29.)

- On September 29, 2005, Plaintiff reported that she had stopped taking her Wellbutrin prescription and started reporting symptoms of depression, sadness, and problems sleeping. (R. at 29.)

- On November 9, 2005, Dr. Lopez characterized Plaintiff's depression as stable, and Plaintiff told Dr. Lopez that she was doing well on her Wellbutrin prescription because she had a good energy level, a good mood, and was able to sleep six to eight hours every night. (R. at 29-30.)

- On February 22, 2006, Plaintiff told Dr. Golas that she had been experiencing anxiety, depression, and post-traumatic stress disorder since her accident. (R. at 30.) However, she also reported going out to eat once or twice a month, visiting family and neighbors monthly, and visiting friends once or twice a month. (*Id.*)

- On May 16, 2006, Dr. Golas noted his opinion that Plaintiff contributed to her own emotional distress by not being able to return to her employment as a dental hygienist. (R. at 30.)

- On October 3, 2006, Plaintiff told Dr. Bailey that she had made a significant effort to attend

a family wedding; however, on November 7 and 22, 2006, she reported little interest in seeing other people.  (R. at 31.)

- In 2009, Plaintiff told Dr. Vawter that she had been getting out of her house more than before.  (R. at 32.)  She also told Dr. Golas that she had been going out to eat once a month and had been visiting with family one to two times a week.  (R. at 32-33.)

Plaintiff also suggests that the ALJ erred in not finding her to be credible because he did not afford more weight to her allegations that her medications cause drowsiness.  (Pl.'s Mot. at 6-7.) However, "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record reflects serious functional limitations."  *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002).  Nothing in the administrative record suggests that Plaintiff's alleged drowsiness caused serious functional limitations.  Instead, the record reflects that Plaintiff, more than once, discussed returning to school.  (*See, e.g.,* R. at 428, 431, 612, 626, 636.)  Furthermore, in 2009, about two months before her second hearing before an ALJ, Plaintiff told Dr. Golas that she showered, walked, and cleaned daily.  (R. at 845.)  She also stated that she "does laundry, drives, and runs errands once a week, and shops once a month."  (*Id.*)

After considering this evidence, the ALJ determined that Plaintiff "does experience symptoms . . . but not to the frequency or debilitating degree of severity alleged."  (R. at 19.) Specifically, the ALJ noted that all Plaintiff's "statements as to her impairment-related symptoms and limitations after April 2005, to medical practitioners or made in conjunction with her disability applications, were offered within a context that included her underlying interest in obtaining related and contingent financial benefits."  (R. at 17-18.)  The ALJ also determined that Plaintiff was not entirely credible because of her statement that her insurance company was making her file for

benefits, because of her belief that she could return to school to learn a new profession, and because of an ongoing expense in the form of a cigarette habit. (R. at 17-19.) Because the ALJ adequately supported his credibility determination with evidence from Plaintiff's own statements, as well as objective findings from the record, the undersigned finds that substantial evidence supports the ALJ's credibility determination.

## 2. The ALJ Assigned Proper Weight to Plaintiff's GAF Score

Although contained in her argument that the ALJ erroneously found her not credible, Plaintiff also suggests that the ALJ erred by assigning little weight to the GAF score assigned by Dr. Bailey. (Pl.'s Mot. at 6.) However, Plaintiff's argument is without merit because substantial evidence supports the weight the ALJ assigned to this score.

The fourth edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") states:

> In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard . . ., additional information is usually required beyond that contained in the DSM-IV diagnosis. . . . It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment and disability.

American Psychiatric Ass'n, *DSM-IV*, xxxii-xxxiii (4th ed., text rev. 2000). Furthermore, the Social Security Administration has explained that the GAF scale "does **not** have a direct correlation to the severity requirements in our mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) (emphasis added). Essentially, "a GAF score, without evidence that it impaired [the] ability to work, does not establish an impairment." *Camp v. Barnhart*, No. 03-7132, 103 F. App'x 352, 354, 2004

WL 1465777, at *1 (10th Cir. June 30, 2004) (alteration in original).

Here, Plaintiff asserts that the ALJ erred in assigning limited weight to the GAF score of 45 that Dr. Bailey assigned to Plaintiff. (Pl.'s Mot. at 6.) However, the undersigned notes that Dr. Bailey assigned this score to Plaintiff on October 15, 2004–about five years before Plaintiff's second hearing before an ALJ. (R. at 773-76.) Furthermore, in assessing Plaintiff's GAF score, Dr. Bailey did not include evidence that a GAF score of 45 impaired Plaintiff's ability to work, and the ALJ properly assigned it limited weight in determining whether Plaintiff was disabled. *Camp*, 103 F. App'x at 354, 2004 WL 1465777, at *1. Notably, this GAF score is the only one included in the administrative record. Therefore, the undersigned finds that substantial evidence supports the ALJ's decision to assign little weight to the GAF score Dr. Bailey assigned to Plaintiff.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for disability insurance benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 11) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such

Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **14th** day of **December, 2011.**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE